## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NORWOOD PROMOTIONAL PRODUCTS HOLDINGS, INC., et al.,[1] | Case No. 09-11547 (PJW) |
| Debtors. | Joint Administration Requested |

## MOTION OF THE DEBTORS FOR ENTRY OF: (I) AN ORDER APPROVING (A) BIDDING PROCEDURES, (B) FORM OF ASSET PURCHASE AGREEMENT AND CERTAIN PAYMENTS TO STALKING HORSE BIDDER THEREUNDER, (C) FORM AND MANNER OF NOTICES, (D) PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (E) DATES AND DEADLINES RELATED THERETO; AND (II) AN ORDER APPROVING THE SALE OF SUBSTANTIALLY ALL THE ASSETS OF THE SELLING DEBTORS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS

Norwood Promotional Products, Inc., Norwood Operating Company, LLC, Advertising Unlimited, LLC, The McCleery-Cumming Company, LLC and Renaissance Publishing Company, LLC, as debtors and debtors in possession (collectively, the "Selling Debtors," and together with Norwood Promotional Products Holdings, Inc., collectively "Norwood" or the "Debtors"), file this motion (the "Motion") for: (i) entry of an order, substantially in the form attached hereto as Exhibit A, (a) approving bidding procedures, (b) approving the form of the stalking horse asset purchase agreement and authorizing certain termination payments to the stalking horse bidder in accordance therewith, (c) approving the form and manner of certain notices, (d) establishing procedures relating to the assumption and assignment of executory contracts and unexpired leases and (e) fixing certain dates and deadlines relating to the

---

[1] The Debtors, along with the last four digits of each Debtor's federal tax identification number, are: Norwood Promotional Products Holdings, Inc. (9391); Norwood Promotional Products, Inc. (4534); Norwood Operating Company, LLC (3446); Advertising Unlimited, LLC (4435); The McCleery-Cumming Company, LLC (2652); and Renaissance Publishing Company, LLC (2740). The location of the Debtors' corporate headquarters and the service address for all Debtors is: 10 W. Market Street, Suite 1400, Indianapolis, Indiana 46204.

submission of bids, the auction (if one is necessary), filing objections and the hearing to consider the sale; and (ii) for entry of an order (x) approving the sale of substantially all of the assets of the Selling Debtors free and clear of all liens, claims, encumbrances and interests and (y) authorizing the assumption and assignment of certain executory contracts and unexpired leases. In support of this Motion, Norwood respectfully states as follows:

## Jurisdiction

1.      This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105(a), 363, 365, 503(b), 507(a), 541, 1107(a) and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and local rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## Introduction

3.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this Motion, the Debtors have filed a motion seeking joint administration of these chapter 11 cases. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases. No committees have been appointed or designated.

K&E 14529705.

4.     A description of Norwood's business, the reasons for commencing these chapter 11 cases and the relief sought from this Court to allow for a smooth transition into chapter 11 are set forth in the *Declaration of Keith A. Maib, Chief Financial Officer of Norwood Promotional Products Holdings, Inc., in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") filed contemporaneously herewith and incorporated by reference as though fully set forth herein.

## Relief Requested

5.     *First*, by this Motion, the Selling Debtors seek entry of an order, substantially in the form attached hereto as Exhibit A (the "Bidding Procedures Order"):

a.     approving the bidding procedures proposed to facilitate the orderly sale (the "Sale") of substantially all of the assets (the "Assets") and the assumption of specified liabilities (the "Assumed Liabilities") of the Selling Debtors in the form attached hereto as Exhibit B and incorporated by reference herein (the "Bidding Procedures");

b.     approving the asset purchase agreement attached hereto as Exhibit C and incorporated by reference herein (the "Stalking Horse Agreement"), and authorizing the payment of the Bidding Protections (as defined herein) to the stalking horse bidder in accordance therewith;

c.     approving the form and manner of notice of the hearing to approve the Sale (the "Sale Hearing," and the notice thereof, the "Sale Notice") attached hereto as Exhibit D and incorporated by reference herein;

d.     establishing procedures for the assumption and assignment of certain executory contracts and unexpired leases (the "Assumption Procedures"), and approving the manner of notice related thereto, in substantially the form attached hereto as Exhibit E and incorporated by reference herein (the "Cure Notice");

e.     fixing certain dates and deadlines, subject to modification as necessary, relating to the Bidding Procedures, the auction (if one is necessary), the Sale Hearing and the filing of certain objections related thereto:

i.     **Bid Deadline**: **4:00 p.m. prevailing Eastern Time on June 16, 2009,** as the deadline by which Qualified Bidders (as defined in the Bidding Procedures) must deliver written copies of their bidding materials consistent with, and to the parties specified in, the Bidding Procedures (the "Bid Deadline");

ii.   **Sale Objection Deadline**: **4:00 p.m. prevailing Eastern Time on June 16, 2009**, as the deadline by which objections, if any, to the entry of an order approving the Sale (the "Sale Order") must be filed and served consistent with, and upon the parties specified in, the Bidding Procedures (the "Sale Objection Deadline");

iii.   **Auction**: **9:00 a.m. prevailing Eastern Time on June 18, 2009**, as the date on which an auction for the Assets (the "Auction"), if one is necessary, will commence at the offices of Kirkland & Ellis LLP, 153 East 53rd Street, New York, New York 10022; and

iv.   **Sale Hearing**: **June 19, 2009**, at a time convenient for the Court, as the date on which the Sale Hearing will be held in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware 19801.

6.   *Second*, by this Motion, the Selling Debtors seek entry of an order, substantially in the form attached hereto as Exhibit F (the "Sale Order"), approving (a) the sale of substantially all of the assets of the Selling Debtors free and clear of all liens, claims, encumbrances and interests in accordance with the Bidding Procedures and (b) the assumption and assignment of executory contracts and unexpired leases consistent with the Assumption Procedures.

**Factual Background**

7.   As set forth in greater detail in the First Day Declaration, Norwood is an industry-leading supplier of promotional products in the United States and maintains a leading market-share position in several industry-recognized promotional product categories. Despite its well-recognized industry prominence, the unprecedented financial crisis affecting credit markets and the banking system, uncertainties in global economic conditions, rising unemployment and all-time low consumer confidence have negatively impacted Norwood's cash position and financial performance, put severe downward pressure on Norwood's highly-leveraged balance sheet and adversely affected Norwood's ability to refinance its existing debt obligations and raise necessary additional funding.

K&E 14529705.

8.    In light of the foregoing, beginning in July 2008, Norwood has been actively exploring potential restructuring alternatives, including, among other things, seeking out new sources of debt or equity capital, refinancing its obligations and effecting the sale of its business. In particular, in addition to discussions with its existing stakeholders, with the assistance of its advisors, Norwood has aggressively canvassed the marketplace, contacting over 200 potential investors, buyers and lenders to try to locate potential financial or strategic partners in an attempt to avert a chapter 11 filing. Despite the foregoing, such efforts proved fruitless.

9.    After considering all available options, in consultation with its financial advisors, professionals and other interested parties, Norwood determined that the most prudent, if not only viable, course of action to preserve the going-concern value of the company would be through an orderly sale of all or substantially all of the Selling Debtors' assets under section 363 of the Bankruptcy Code, subject to higher and better bids pursuant to a Court approved auction process. In order to maximize value, Norwood sought a "stalking horse" bidder, engaging in discussions with certain interested parties as well as with its secured creditors to that end.  Ultimately, after good faith, arm's-length negotiations between the Selling Debtors and Promotional Holdings, LLC, a Delaware limited liability company (the "Purchaser"), and the financial advisors and attorneys of each of the foregoing, the Selling Debtors and the Purchaser entered into the Stalking Horse Agreement, which contemplates the sale of substantially all of the Assets of the Selling Debtors for a purchase price, including assumption of the Assumed Liabilities, of approximately $132.5 million (subject to certain adjustments).

10.    Against this backdrop, with a stalking horse and a minimum purchase price in place, Norwood made the difficult but prudent decision to commence these chapter 11 cases to

implement a competitive bidding process and promptly effectuate the Sale, either to the Purchaser or to a higher and better bidder that emerges from the Auction.

11. The proposed sale transaction is fair and appropriate and will achieve the ultimate goal of these chapter 11 cases—maximizing value available to stakeholders, including by preserving the going concern value of the Selling Debtors' business. To that end, the Selling Debtors seek this Court's approval of the proposed sale transaction and related Bidding Procedures to enable the Selling Debtors to solicit competing offers for substantially all of their assets to ensure maximum recovery for their estates. To preserve going-concern value and obtain the anticipated benefits of the proposed transaction, it is imperative that this process be completed expeditiously. Given the stress on all aspects of the Debtors' business resulting from operating while in chapter 11—including the administrative expenses incurred in connection therewith—and considering Norwood's rapidly deteriorating liquidity position, key relationships with suppliers, distributors and other business partners simply cannot be preserved if the sale process is not concluded quickly.

12. The Selling Debtors believe that the commencement of these chapter 11 cases and the implementation of an orderly yet prompt sale process conducted under the supervision of this Court, with Purchaser providing the floor against which interested parties may bid, will allow the Selling Debtors to consummate a going-concern sale of the business, thus maximizing the value of their estates to the benefit of all stakeholders.

K&E 14529705.

### The Proposed Bidding Procedures and Other Relief Related to the Sale

A. **Provisions in the Sale Order, Stalking Horse Agreement, Bidding Procedures and Bidding Procedures Order to Be Highlighted Pursuant to Local Rule 6004-1**

13.     The Selling Debtors believe the following provisions of the Sale Order, the Stalking Horse Agreement, the Bidding Procedures and the Bidding Procedures Order must be highlighted (the "Highlighted Provisions") pursuant to Local Rule 6004-1.[2]

| Provision | Summary Description |
|---|---|
| Releases:<br>L.R. 6004-1(b)(iv)(C) | *Purchaser and the Selling Debtors*: Customary for transactions of this type, including, generally, a reciprocal release by Purchaser and the Selling Debtors (and each of their respective successors and assigns) from any and all Liabilities, actions, rights of action, contracts, indebtedness, obligations, claims, causes of action, suits, damages, demands, costs expenses and attorneys' fees whatsoever, of every kind and nature, known or unknown, disclosed or undisclosed, accrued or unaccrued, existing at any time (other than those arising out of knowing or willful fraud or criminal misconduct), that Purchaser and the Selling Debtors have or may have against the other. **See Agmt., at § 12.2.**<br><br>*Third Parties*: The Sale Order shall be effective as a determination that, except for the Assumed Liabilities, all Interests of any kind or nature whatsoever existing as to the Debtors or the Purchased Assets prior to the Closing have been unconditionally released, discharged and terminated. **See Sale Ord., at ¶ 10.** |
| Auction:<br>L.R. 6004-1(b)(iv)(D) | *Auction*: If the Selling Debtors receive at least one Qualified Bid on or prior to the Bid Deadlines, the Selling Debtors will conduct an auction at the offices of Kirkland & Ellis LLP, 153 E. 53rd Street, New York, New York 10022. **See Bid. Proc., at ¶ 10; Agmt., at §2.1(c).** |

---

[2]     This summary is qualified in its entirety by the provisions of the proposed the Sale Order, the Stalking Horse Agreement, the Bidding Procedures and the Bidding Procedures Order, as applicable. Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Sale Order, the Stalking Horse Agreement, the Bidding Procedures and the Bidding Procedures Order, as applicable. To the extent there is any conflict between (a) this summary and (b) the proposed the Sale Order, the Stalking Horse Agreement, the Bidding Procedures and the Bidding Procedures Order, as applicable, the terms of the latter (b) shall govern. Additionally, to the extent required under Local Rule 6004-1(b)(iv), the Selling Debtors have provided a separate justification for certain of the Highlighted Provisions under the "Basis for Relief" heading below.

K&E 14529705.

| Provision | Summary Description |
|---|---|
| | *Competing Offers*: |
| | <u>Prior to the Petition Date</u>: The Selling Debtors will not discuss, encourage, facilitate, negotiate, undertake, initiate, solicit, authorize, propose or enter into a Competing Transaction or furnish any information covering the business, properties or assets of the Selling Debtors in connection with a Competing Transaction, except, in either case, pursuant to negotiations with the Selling Debtors' creditors. |
| | <u>The Petition Date to the Auction Date</u>: The Selling Debtors will be permitted to initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by any Person (in addition to Purchaser) with respect to any transaction involving the direct or indirect sale, transfer or other disposition of a material portion of the Purchased Assets to a purchaser or purchasers other than Purchaser the consummation of which would be substantially inconsistent with the Stalking Horse Agreement consistent with the Bidding Procedures Order. |
| | <u>After the Auction Date</u>: The Selling Debtors will not participate in any discussions with, or furnish any information to, any Person with respect to any Competing Transaction. |
| | <u>See</u> **Agmt. at § 7.2.** |
| Deadlines and <u>Closing Conditions</u>: L.R. 6004-1(b)(iv)(E) | *Closing Date*: The closing will take place at the offices of Jones Day, 222 East 41st Street, New York, New York at 10:00 a.m. prevailing Eastern Time on the 3rd Business Day following the day on which the Closing Conditions are satisfied or waived, unless otherwise agreed to in writing by both parties. |
| | *Closing Conditions*: customary for sale transactions of this type, including, generally, that: |
| | • the representations and warranties made by the parties to the Stalking Horse Agreement (not qualified by materiality or Seller Material Adverse Effect or Purchaser Material Adverse Effect) shall be materially true and correct, and both parties shall have received a certificate signed by an authorized officer of the other to such effect; |
| | • the Selling Debtors and Purchaser shall have performed and complied in all material respects with all obligations required in the Stalking Horse Agreement to be performed prior to the Closing Date, and both parties shall have received a certificate signed by an authorized officer of the other to such effect; |

K&E 14529705.

| Provision | Summary Description |
|---|---|
| | - the Selling Debtors and Purchaser shall have delivered to the other the items set forth in Section 4.2 and Section 4.3 of the Stalking Horse Agreement, respectively; |
| | - the Closing Working Capital and the Closing Cash Amount shall have been finally determined; |
| | - between January 3, 2009 and the Closing Date, there shall not have occurred any Seller Material Adverse Effect; |
| | - the Interim Revenues and Interim EBITDA shall have been finally determined and not less than the Interim Minimum Revenues and Interim Minimum EBITDA, respectively; |
| | - there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Sale; |
| | - the Bankruptcy Court shall have entered the Sale Order, in form and substance reasonably acceptable to the Selling Debtors and Purchaser, and such Sale Order shall have become a final Order; and |
| | - the waiting period under the HSR Act shall have expired or early termination shall have been granted. |
| | **See Agmt., at § 10.** |
| Good Faith Deposit: <br><br> L.R. 6004-1(b)(iv)(F) | *With respect to the Purchaser*: Purchaser shall deposit the sum of $13.173 million by wire transfer of immediately available funds (the "Deposit Amount") with the escrow agent under the Escrow Agreement by 5:00 p.m. prevailing Eastern Time, on or prior to the 11th Business Day after the date of the Stalking Horse Agreement. **See Agmt., at ¶ 3.2.** The Deposit Amount may be forfeited if there shall be a breach by Purchaser of any representation or warranty, or any covenant or agreement contained in the Stalking Horse Agreement which would result in a failure of a condition set forth therein and which breach has not been cured in accordance with the terms thereof or if there shall be a breach by Purchaser of its obligation to post the Deposit Amount. **See Agmt., at ¶ 3.2.** <br><br> *With respect to Potential Bidders*: A good faith cash deposit (the "Good Faith Deposit") in the form of a bank or certified check (or other form acceptable to the Selling Debtors in their sole discretion) payable to the order of Norwood Promotional Products, Inc (or such other party as the Selling Debtors may determine to hold such funds in escrow) in an amount equal to $13,173,000. |

K&E 14529705.

| Provision | Summary Description |
|---|---|
| | *With respect to the Prepetition Agent*: The Prepetition Agent shall be allowed to provide a Good Faith Deposit either (i) in the same amount and form as other Potential Bidders or (ii) in the form of an irrevocable letter of credit in an amount of not less than $13,173,000 in support of an Agent Bid (which may be drawn on the same basis as the Good Faith Deposit from every other Potential Bidder). **See Bid. Proc., at ¶ 7(c).** |
| Use of Proceeds: L.R. 6004-1(b)(iv)(H) | Purchaser shall pay:<br><br>• the Cash Consideration to the Company (less the Closing DIP Amount, the aggregate amount of all Carve Out Expenses and the Houlihan Carve-Out);<br><br>• the Houlihan Carve-Out to Houlihan;<br><br>• an aggregate amount equal to the amount of Carve-Out Expenses (other than those contained in the Houlihan Carve-Out) to an escrow agent;<br><br>• the Closing DIP Amount to the DIP Agent (less the Deposit Amount and all accrued investment income thereon); and<br><br>• the Deposit Amount and all accrued investment income thereon will be paid to the DIP Agent.<br><br>**See Agmt, at § 3.5(b).**<br><br>The Purchase Price allocated to each Seller shall be comprised first of the Assumed Liabilities of each Seller and then the remainder of the Purchase Price. Purchaser and the Selling Debtors shall file all Tax Returns (including Form 8594) consistent with, and shall take no tax position inconsistent with the Allocation Statement provided that the Allocation Statement is reasonable. **See Agmt., at § 11.2.** |
| Tax Exemption: L.R. 6004-1(b)(iv)(I) | The transfer of Purchased Assets pursuant to the Sale Transaction is a transfer pursuant to section 1146(a) of the Bankruptcy Code, and accordingly shall not be taxed under any law imposing a stamp tax or a sale, transfer, or any other similar tax. **See Sale Ord., at ¶ 28.** |

K&E 14529705.

| Provision | Summary Description |
|---|---|
| Record Retention:<br><br>L.R. 6004-1(b)(iv)(J) | The Purchaser will not acquire minute books, stock ledgers, corporate seals and stock certificates of the Selling Debtors, and other similar books and records that the Selling Debtors are required by Law to retain or that the Selling Debtors determine are necessary or advisable to retain. **See Agmt., at § 2.2(d)**.<br><br>The Selling Debtors and Purchaser agree that each shall preserve and keep the records held by it or their Affiliates relating to the Business for a period of seven years from the Closing Date and shall make the same available as may be reasonably required. **See Agmt., at § 8.7**. |
| Avoidance Actions:<br><br>L.R. 6004-1(b)(iv)(K) | "Purchased Assets" includes, among other things, any rights, claims or causes of action of the Selling Debtors (including Avoidance Actions) against third parties relating to assets, properties, business or operations of the Selling Debtors arising out of events occurring on or prior to the Closing Date. **See Agmt., at § 2.1(b)**. |
| Successor Liability:<br><br>L.R. 6004-1(b)(iv)(L) | Under no circumstances shall the Purchaser be deemed a successor of or to the Debtors for any Interest against or in the Debtors or the Purchased Assets of any kind or nature whatsoever. Except for the Assumed Liabilities, the sale, transfer, assignment and delivery of the Purchased Assets shall not be subject to any Interests, and Interests of any kind or nature whatsoever shall remain with, and continue to be obligations of, the Debtors. **See Sale Ord., at ¶ 9**. |
| Unexpired Leases to be Sold Free and Clear:<br><br>L.R. 6004-1(b)(iv)(M) | Purchased Assets (including unexpired leases) shall be transferred to the Purchaser, and upon the Closing of the Sale shall be, free and clear of all Interests of any kind or nature whatsoever, and all such Interests of any kind or nature whatsoever shall attach to the net proceeds of the Sale in the order of their priority, with the same validity, force and effect which they now have as against the Purchased Assets, subject to any claims and defenses Debtors may possess with respect thereto. **See Sale Ord., at ¶ 6**. |
| Credit Bid:<br><br>L.R. 6004-1(b)(iv)(N) | Subject to the terms of the Bidding Procedures, the Prepetition Agent, on behalf of the Prepetition Lenders, shall be deemed a Qualified Bidder and entitled to credit bid the Prepetition Lenders' senior secured claims in accordance with section 363(k) of the Bankruptcy Code. **See Bid. Proc., at ¶ 8; Bid. Proc. Ord., at ¶ 9**. |
| Stay Waiver:<br><br>L.R. 6004-1(b)(iv)(O) | The Sale Order grants a waiver of the 10-day stay period under Bankruptcy Rules 6004(g) and 6006(d). **See Sale Ord., at ¶ 30**. |

K&E 14529705.

| Provision | Summary Description |
|---|---|
| <u>Qualifications of Bidders:</u><br><br>L.R. 6004-1(c)(i)(A) | Potential Bidders will be required to deliver to the Selling Debtors and their counsel, on or before the Bid Deadline, (i) an executed confidentiality agreement in form and substance satisfactory to the Selling Debtors and their counsel and (b) current financial statements (or such other information as required by the Selling Debtors, in their sole discretion). A Potential Bidder who so delivers and who the Selling Debtors determine in their sole discretion is likely (based on availability of financing, experience and other considerations) to be able to consummate the Sale will be deemed to be a "<u>Qualified Bidder</u>." <u>See</u> **Bid. Proc., at ¶¶ 2, 3**. |
| <u>Qualified Bids:</u><br><br>L.R. 6004-1(c)(i)(B) | <u>*Bid Deadline*</u>: Bid Packages must be received no later than <u>**4:00 p.m. prevailing Eastern Time on June 16, 2009**</u>.<br><br><u>*Qualified Bid*</u>: is the Purchaser's offer to acquire the Assets pursuant to the Stalking Horse Agreement, or, if applicable, another Qualified Bidder's offer to acquire the Assets if the Selling Debtors believe that such bid is higher or otherwise better than the bid set forth in the Stalking Horse Agreement and would be consummated if selected as the Successful Bid and such offer was received prior to the Bid Deadline and included:<br><br>• an executed copy of an asset purchase agreement that is marked to show changes to the Stalking Horse Agreement, irrevocable until two (2) Business Days after the Sale Hearing and for the purchase of the Assets "as is, where is" in exchange for a purchase price that is greater than or equal to:<br><br>   • the Purchase Price (including all adjustments), plus<br><br>   • $3,900,000 (the amount of the Break-Up Fee plus the maximum amount of the Expense Reimbursement); <u>provided</u>, <u>however</u>, that, with respect to the Agent Bid, the amount shall be $3,500,000, plus<br><br>   • $1,000,000 (the "<u>Initial Bid Increment</u>");<br><br>• the Selling Debtors may consider a combination of multiple Bids, each of which is for less than all of the Assets, so long as such combination of Bids offers an aggregate amount equal to the Initial Bid Increment and each Bid otherwise meets the requirements of a Qualified Bid;<br><br>• such financial and other information that the Selling Debtors in their discretion deem appropriate to ensure adequate assurance of future performance under section 365 of the Bankruptcy Code; |

K&E 14529705.

| Provision | Summary Description |
|---|---|
| | • a Good Faith Deposit; and |
| | • a written statement that the bid is not conditioned on obtaining financing or other financing contingencies or the outcome of unperformed due diligence by the bidder or any other due diligence contingencies. |
| | <u>See</u> **Bid. Proc., at ¶ 7.** |
| <u>Bid Protections:</u><br>L.R. 6004-1(c)(i)(C) | Customary and appropriate for transactions of this nature, including:<br><br>*Break-Up Fees*: Purchaser shall be entitled to (i) reimbursement from the Selling Debtors of up to $1 million of expenses incurred by the Purchaser in connection with the sale transaction (the "<u>Expense Reimbursement</u>") and (ii) payment from the Selling Debtors of a cash amount ranging from $2.5 to $2.9 million (the "<u>Break-Up Fee</u>") depending on the circumstances set forth in and pursuant to the Stalking Horse Agreement. <u>See</u> **Agmt., at § 7.3.**<br><br>*Bidding Increments*: $1,000,000 (after the Initial Bid) and $250,000 at the Auction. <u>See</u> **Bid. Proc., at ¶¶ 7(a), 12(c).**<br><br>*Break-Up Fee and the Expense Reimbursement*. The amount of the Break-Up Fee and the Expense Reimbursement will be credited to and deemed a part of any bid of the Purchaser. <u>See</u> **Bid. Proc., at ¶ 12(d).** |
| <u>Back-Up Bidder:</u><br>L.R. 6004-1(c)(i)(E) | At the conclusion of the Auction, the Selling Debtors, in their sole discretion, may require the second highest Qualified Bidder to serve as a "<u>Back-Up Bidder</u>" and remain obligated to close the Sale at the terms set forth in its last Bid (the "<u>Back-Up Bid</u>") in the event that the Sale to the Successful Bidder does not close. The Back-Up Bidder shall be obligated until ten (10) business days after the Sale Order becomes final and non-appealable, or such other time period as agreed to by the Back-Up Bidder and the Selling Debtors. <u>See</u> **Bid. Proc., at ¶ 16.** |

## B. Overview of the Bidding Procedures

14. The Selling Debtors crafted the Bidding Procedures to permit an expedited sale necessitated by the circumstances faced by the Selling Debtors, consistent with the timeline available to the Selling Debtors under the Stalking Horse Agreement and the terms of their proposed postpetition financing, while simultaneously fostering an orderly and fair sale process

K&E 14529705.

that will confirm that the Purchaser's bid is the best and highest bid for the Assets or promptly identify any other higher and better alternatives. The Bidding Procedures are set forth in detail in Exhibit B hereto and, as such, are not restated herein. The Bidding Procedures describe, among other things, the requirements for prospective purchasers to participate in the process, the availability and conduct of due diligence by prospective bidders, the deadline and requirements for submitting a competing bid, the method and criteria for bids to become "qualified," the manner in which qualified bids will be negotiated, clarified and improved and the criteria for selecting the Successful Bidder, including, if necessary, through the conduct of a Court-supervised auction. The Bidding Procedures also establish the minimum consideration the Successful Bidder must provide in exchange for the Assets and any terms and conditions the Successful Bidder must satisfy to acquire the Assets. The Selling Debtors will consider all proposals that are deemed qualified in accordance with the Bidding Procedures.

15.     The Selling Debtors reserve the right to modify the Bidding Procedures as necessary or as they deem appropriate, in consultation with the Committee, the Purchaser, the Prepetition Agent (as defined in the Bidding Procedures) and such other persons as the Selling Debtors deem appropriate, to maximize value for their estates and stakeholders.

## C.     Notice, Sale Objection Deadline and Related Procedures

16.     The Selling Debtors are also seeking approval of the following notice, objection and related procedures:

    a.    **Actual Notice of the Sale**. Within three (3) days of the entry of the Bidding Procedures Order, the Selling Debtors propose to serve the Sale Notice upon the parties identified in the Bidding Procedures Order.

    b.    **Publication Notice of the Sale**.  Within three (3) days of the entry of the Bidding Procedures Order, the Selling Debtors propose to publish the Sale Notice, modified for publication, as necessary, in *The Wall Street Journal*, national edition, and in such other publications, if any, as the Selling Debtors and their advisors determine will best-promote the marketing and sale of the Assets.

c.  **Objection Contents**. Any objection to the Motion as it relates to the Sale, the Sale Order and/or the Sale Hearing (each, a "Sale Objection") must (i) be in writing, (ii) state with specificity the nature of such objection and (iii) comply with applicable Bankruptcy Rules and Local Rules.

d.  **Sale Objection Deadline**. Sale Objections, if any, must be filed with the Court and served so as to be **actually received** by the Notice Parties (defined below) no later than the Sale Objection Deadline.

e.  **Notice Parties**. In addition to counsel to any statutory committee (the "Committee") appointed in these chapter 11 cases, the following parties, are referred to herein and defined in the Bidding Procedures Order, collectively, as the "Notice Parties":

| | |
|---|---|
| **KIRKLAND & ELLIS LLP**<br>Attn: David L. Eaton<br>Attn: Lisa G. Laukitis<br>Citigroup Center<br>153 East 53rd Street<br>New York, New York 10022-4611 | **YOUNG CONAWAY**<br>**STARGATT & TAYLOR, LLP**<br>Attn: Pauline K. Morgan<br>Attn: Edmon L. Morton<br>The Brandywine Building<br>1000 West Street, 17th Floor<br>Wilmington, Delaware 19801 |
| *Co-Counsel to the Debtors* | |
| **JONES DAY**<br>Attn: Richard H. Engman<br>Attn: John K. Kane<br>222 East 41st Street<br>New York, New York 10017:<br><br>*Counsel to Purchaser* | |
| **THE OFFICE OF THE UNITED STATES TRUSTEE FOR THE DISTRICT OF DELAWARE**<br>Attn: Richard Schepacarter<br>844 King Street, Suite 2207<br>Wilmington, Delaware 19801 | |

## The Proposed Assumption Procedures

17.  To facilitate and effect the sale of the Assets, the Selling Debtors seek authority to assume and assign certain executory contracts and unexpired leases in connection with the Sale consistent with the Assumption Procedures established in the Bidding Procedures Order. The Selling Debtors propose that the Assumption Procedures set forth in the Bidding Procedures Order apply whether the Purchaser or another party is the Successful Bidder of the Assets. The proposed Assumption Procedures are as follows:

a. **Contract and Lease Schedule**. Due to the nature of the bidding process, it is impossible for the Selling Debtors to identify at this time which executory contracts and unexpired leases will ultimately be assumed and assigned. The Selling Debtors will file a schedule (the "Assumption and Assignment Schedule") of the executory contracts and unexpired leases proposed to be assumed and assigned in connection with the Sale Transaction (the "Purchased Contracts"), including amounts required, if any, to cure monetary defaults arising under any Purchased Contract (the "Cure Amount") as soon as reasonably practicable after the entry of the Bidding Procedures Order.

b. **Subsequent Modifications**. Within one (1) business day of the Selling Debtors' receipt of notice from Purchaser that it has designated additional contracts as Purchased Contracts or excluded contracts previously so designated, the Selling Debtors will file an amended Assumption and Assignment Schedule with the Court.

c. **Notice**. To ensure counterparties to Purchased Contracts receive advance notice of the assumption and assignment thereof, within two (2) days of the date the Assumption and Assignment Schedule (or the amended Assumption and Assignment Schedule, as applicable) is filed with the Bankruptcy Court, the Selling Debtors will serve the Cure Notice upon each counterparty to a Purchased Contract. The Cure Notice will, among other things, (i) identify the Purchased Contract proposed to be assumed and assigned and the associated Cure Amount, (ii) provide a means by which counterparties to Purchased Contracts can obtain information related to adequate assurance of future performance, (iii) instruct counterparties to Purchased Contracts as to the ways by which they may obtain and/or view copies (including electronic copies) of the Bidding Procedures, Bidding Procedures Order and other related documents, (iv) set forth the date and time of the Sale Hearing and (v) explain how to file Cure Objections (defined below).

d. **Cure Objections**. Any objection to the assumption and assignment of a Purchased Contract, including, without limitation to the Cure Amount or adequate assurance of future performance proposed with respect thereto (each, a "Cure Objection") must: (i) be in writing, (ii) state with specificity the nature of such objection and alleged Cure Amount, (iii) include applicable and appropriate documentation in support of such alleged Cure Amount, (iv) comply with applicable Bankruptcy Rules and Local Rules and (v) be filed with this Court and served so as to be **actually received** by the Notice Parties on or prior to the Sale Objection Deadline.

e. **Alternative Objection Deadline**. If the Auction results in a Successful Bidder other than the Purchaser, the deadline for objecting to whether such Successful Bidder has provided adequate assurance of future performance under a Purchased Contract shall be at Sale Hearing.

f. **Resolution of Objections**. If a party to a Purchased Contract timely files and serves a Cure Objection in accordance with the Assumption Procedures asserting a higher Cure Amount than that which is listed on the Cure Notice, and the parties are not able to consensually resolve the dispute prior to the Sale Hearing, the amount to be paid under section 365 of the Bankruptcy Code with respect to such Cure Objection will be

K&E 14529705.

determined at the Sale Hearing or such other date and time as may be fixed by this Court. Any other objections to the proposed assumption and assignment of the Purchased Contracts will be heard at the Sale Hearing. The Purchaser shall be under no obligation to consummate the Sale Transaction prior to the date all Cure Amounts have been finally determined or agreed.

g. **Failure to Timely-File and Serve Cure Objections**. Any party who fails to timely file and serve a Cure Objection will be forever barred from objecting to such Cure Amount and from asserting any additional cure or other amounts against the Selling Debtors, the Selling Debtors' estates, the Purchaser or the Successful Bidder with respect to its respective Purchased Contract(s) and will be deemed to consent to the Sale and the proposed assumption and assignment of its Purchased Contract(s).

## Basis for Relief

**I.  Ample Authority Exists to Approve the Bidding Procedures, Including the Stalking Horse Agreement and Bidding Protections Associated Therewith.**

18.    The Selling Debtors submit that the Bidding Procedures, including the Bidding Protections (as defined below) and the dates and deadlines relating to the Auction and the Sale Hearing set forth therein, are appropriate and warranted under the circumstances, consistent with procedures routinely approved by courts in this district and in the best interest of the Selling Debtors and their stakeholders. Accordingly, the Selling Debtors respectfully request that the Court approve the Bidding Procedure on the terms set forth therein.

**A.    The Proposed Bidding Procedures Should be Approved.**

19.    In authorizing a chapter 11 sale and approving bidding procedures in connection therewith, courts may rely on several legal theories rooted in sections 1107(a), 1108, 363(b) and 105(a) of the Bankruptcy Code. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, debtors in possession are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the fiduciary duties of any debtor in possession is the obligation to "protect and preserve the estate, including an operating business's going-concern value." Id.

K&E 14529705.

20.     Consistent with a debtor's fiduciary duties, courts regularly authorize debtors to use or sell assets of the estate other than in the ordinary course of business, free and clear of liens, claims and encumbrances under section 363 of the Bankruptcy Code, which provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." See 11 U.S.C. § 363(b)(1). In addition, the Court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title" pursuant to section 105(a) of the Bankruptcy Code, including the provisions for the sale of property of the estate outside the ordinary course of business under section 363 of the Bankruptcy Code.

21.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. See In re Mushroom Transp. Co., Inc., 382 F.3d 325, 339 (3rd Cir. 2004) (debtor in possession "had a fiduciary duty to protect and maximize the estate's assets"); Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery, 330 F.3d 548, 573 (3rd Cir. 2003) (same).  To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales.  See, e.g., In re Montgomery Ward Holding Corp., No. 97-1409 (PJW) (Bankr. D. Del. Aug. 6, 1997); In re Fruehauf Trailer Corp., No. 96-1563 (PJW) (Bankr. D. Del. Jan. 31, 1997); see also Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 659 (S.D.N.Y. 1992) (such procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); Integrated Resources, 147 B.R. at 659 (S.D.N.Y. 1992) (bidding procedures "encourage bidding and . . . maximize the value of the debtor's assets"); In re Edwards, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural

bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); In re Fin. News Network, Inc., 126 B.R. 152, 156 (S.D.N.Y. 1991) (as amended) (enforcement of "court-imposed rules for the disposition of assets [is intended] to provide an adequate basis for comparison of offers, and to provide for a fair and efficient resolution of bankrupt estates").

22.     Here, the Selling Debtors believe that the Bidding Procedures are fair and appropriate under sections 105 and 363 of the Bankruptcy Code and should be approved. The Bidding Procedures are designed to facilitate orderly yet competitive bidding to maximize the recovery for the Selling Debtors and their estates in connection with the Sale. In particular, the Bidding Procedures contemplate an open auction process with minimum barriers to entry, and the proposed deadlines provide interested parties with sufficient time to perform due diligence.

23.     The Bidding Procedures provide Potential Bidders with more than 20-days' notice of the Sale Hearing required by Bankruptcy Rule 2002, which, given the Selling Debtors' inability to continue operations absent the support of their postpetition lenders, provides more than sufficient notice and opportunity to interested parties to acquire the information necessary to submit a timely and well-informed bid. Indeed, given that the pressing liquidity crisis facing the Selling Debtors precludes a long marketing and sale process, the Selling Debtors have already assembled an extensive data room and prepared a form confidentiality agreement to provide to interested parties in order to access diligence information subject to the Bidding Procedures.

24.     At the same time, the Bidding Procedures provide the Selling Debtors with an adequate opportunity to consider competing bids and select the highest and best offer for the completion of the Sale. Entering into the Stalking Horse Agreement with the Purchaser ensures fair market value by setting the minimum purchase price which can then be tested in the

K&E 14529705.

marketplace. As such, the Selling Debtors and their creditors can be assured that, taking into account the Selling Debtors' financial condition and the current state of the economy, the consideration paid for the Assets will be fair, reasonable and in the best interest of the Selling Debtors' estates and stakeholders.

25.    Moreover, the Bidding Procedures contain terms and conditions common for a process through which a chapter 11 sale of this nature is consummated. See, e.g., In re Wickes Holdings, LLC, No. 08-10212 (KJC) (Bankr. D. Del. Feb. 19, 2008); In re Tweeter Home Entm't Group, Inc., No. 07-10787 (PJW) (Bankr. D. Del. July 13, 2007); In re Radnor Holdings Corp., No. 06-10894 (PJW) (Bankr. D. Del. Sep. 22, 2006); In re Ultimate Elecs., Inc., No. 05-12339 (Bankr. D. Del. Sept. 9, 2005); In re Montgomery Ward Holding Corp., No. 97-1409 (PJW) (Bankr. D. Del. Aug. 6, 1997); In re Fruehauf Trailer Corp., No. 96-1563 (PJW) (Bankr. D. Del. Jan. 31, 1997).[3]

**B.    The Minimum Overbid Requirement Should be Approved.**

26.    The Bidding Procedures contemplate an overbid protection in the form of a minimum bid increment beyond the consideration currently proposed in the Stalking Horse Agreement. Namely, with certain exceptions as to the Agent Bid, a Qualified Bid must provide for net consideration to the Selling Debtors' estates of least $1,000,000 more than the sum of the approximately $132.5 million cash consideration provided by the Purchaser, plus the amount of the Termination Payments discussed below. The Selling Debtors submit that, given the value of this transaction, the minimum initial incremental overbid amount is reasonable and appropriate

---

[3]    Because of the voluminous nature of the orders cited herein, they are not attached to the Motion. Copies of these orders are available on request of Norwood's counsel.

under the circumstances, will enable the Selling Debtors to simultaneously maximize the value for their Assets while limiting the chilling effect in the marketing process and is consistent with the overbid increments previously approved by courts in this district. <u>See, e.g.</u>, <u>Dura Auto. Sys., Inc.</u>, No. 06-11202 (KJC) (Bankr. D. Del. July 24, 2007) (approving $750,000 increment); <u>New Century TRS Holdings, Inc.</u>, No. 07-10416 (KJC) (Bankr. D. Del. Apr. 20, 2007) (approving $500,000 increment); <u>Three A's Holdings, L.L.C.</u>, No. 06-10886 (BLS) (Bankr. D. Del. Sept. 7, 2006) (approving $500,000 increment).[4]

## C. The Proposed Bidding Protections Should be Approved.

27.    The Selling Debtors believe that the Termination Payments and Expense Reimbursement (together, the "<u>Bidding Protections</u>") to be paid to the Purchaser under the circumstances described in the Stalking Horse Agreement in the respective amounts of up to $2.9 million and $1 million are:  (i) actual and necessary costs and expense of preserving the Selling Debtors' estates, within the meaning of sections 503(b) and 507(a) of the Bankruptcy Code; (ii) commensurate to the real and substantial benefit conferred upon the Selling Debtors' estates by the Purchaser; (iii) reasonable and appropriate in light of the size and nature of the proposed Sale Transaction and comparable transactions, the commitments that have been made and the efforts that have been and will be expended by the Purchaser; and (iv) necessary to induce the Purchaser to continue to pursue the Sale Transaction and to continue to be bound by the Stalking Horse Agreement.   Indeed, the Selling Debtors submit that the Termination

---

4    Because of the voluminous nature of the orders cited herein, they are not attached to the Motion.  Copies of these orders are available on request of Norwood's counsel.

Payments, together with the reflect an appropriate exercise of the Selling Debtors' business judgment.

28.     Approval of the Bidding Protections is governed by the standard for determining the appropriateness of bidding incentives in the bankruptcy context established by the Third Circuit in Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527 (3d Cir. 1999).  Specifically, the Third Circuit held that even though bidding incentives are measured against a business judgment standard in nonbankruptcy transactions, the administrative expense provisions of section 503(b) of the Bankruptcy Code govern in the bankruptcy context, to be approved, bidding incentives must provide some benefit to the debtor's estate.  See Calpine Corp., 181 F.3d at 533-37 (3rd Cir. 1999) (detailing situations where bidding incentives are appropriate in bankruptcy because they provide a benefit to the estate).

29.     The Calpine Court went on to identify at least two instances in which bidding protections may benefit the estate.  *First*, benefit may be found if the bidding procedures promote more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited.  Id. at 537.  *Second*, where the availability of bidding protections induce a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id.

30.     Here, the Bidding Protections—equal to an aggregate amount of less than 3% of the Purchase Price—are reasonable and appropriate given the size, nature and complexity of this transaction and the efforts expanded by the Purchaser in connection herewith.  The Bidding Protections, the product of good faith, arm's-length dealings, are a material inducement for, and

K&E 14529705.

a condition of, the Purchaser's entry into the Sale Transaction, and cover little more than the costs and expenses incurred as a result of the extensive analysis, due diligence investigation and negotiations undertaken by the Purchaser in connection with the Sale Transaction. Should the Purchaser decide not to go forward with the Sale, the Selling Debtors would lose the benefits inured to their estates by having the stalking horse bid, including higher bids that, absent such a floor, might not have otherwise been realized.

31.     In contrast, by incentivizing the Purchaser to serve as the stalking horse bidder by way of the Bidding Protections, the Selling Debtors are assured that, at a minimum, the Sale will generate a purchase price they believe to be fair, while at the same time, providing them with the upside of even greater benefit to the estates. Thus, the Purchaser has provided a material benefit to the Selling Debtors and their estates by increasing the likelihood that the best possible price for the Purchased Assets will be received. Indeed, the benefits inured to the Selling Debtors' estates as a result of the Stalking Horse Agreement and commitments made by the Purchaser thereunder—especially given the current economic climate—easily pass muster under the Third Circuit's "administrative expense" standard.

32.     Moreover, the Bidding Protections are consistent with those previously approved by courts in this district. See, e.g., In re Global Motorsport Group, Inc., No. 08-10192 (KJC) (Bankr. D. Del. Feb. 14, 2008) (breakup fee of approximately 4% of sale price); Dura Auto. Sys., Inc., No. 06-11202 (KJC) (Bankr. D. Del. July 24, 2007); New Century TRS Holdings, Inc., No. 07-10416 (KJC) (Bankr. D. Del. Apr. 20, 2007); Three A's Holdings, L.L.C., No. 06-10886 (BLS) (Bankr. D. Del. Sept. 7, 2006); In re Radnor Holdings, No. 06-10894 (Bankr. D. Del. September 22, 2006) (aggregate fee and expense reimbursement of 3% permitted); In re Riverstone Networks, No. 06-10110 (Bankr. D. Del. February 24, 2006) (expense reimbursement

up to $1 million where the stalking horse purchase price was $170 million); In re Great Kansas City Paper, Inc., No. 03-10048 (Bankr. D. Me. February 18, 2003) (expense reimbursement up to $750,000 in addition to a break-up fee of 5.4%, the aggregate value of which was $5 million); In re FSC Corp., No. 00-04659 (Bankr. N.D. Ill. February 28, 2000) (expense reimbursement up to $500,000 in addition to a break-up fee of 3.4%, valued at $1,500,000).[5]

33.     In light of the foregoing, the Selling Debtors submit that the Bidding Protections are appropriate and justified under the circumstances, modest given the complexity of this transaction and the current state of the market and consistent with like terms routinely authorized by courts in this district.  Accordingly, because they are in the best interest of the Selling Debtors and their stakeholders, the Selling Debtors respectfully request that the Court approve the Bidding Protections.

## II.  Ample Authority Exists to Approve the Assumption and Assignment of Purchased Contracts and the Assumption Procedures Related Thereto.

### A.  The Assumption of Purchased Contracts Reflects Sound Business Judgment.

34.     Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the Bankruptcy Court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.  The standard that is applied by courts in the Third Circuit in determining whether an executory contract or unexpired lease should be assumed is the debtor's "business judgment" that the assumption is in its economic best interests.  See, e.g., Sharon Steel Corp. v. National Fuel Gas Distrib. Corp., 872 F.2d 36, 40 (3rd Cir. 1989); see also NLRB v.

---

[5]  Because of the voluminous nature of the orders cited herein, they are not attached to the Motion.  Copies of these orders are available on request of Norwood's counsel.

K&E 14529705.

Bildisco & Bildisco, 465 U.S. 513, 523 (1984) (describing business judgment test as "traditional") (superseded in part by 11 U.S.C. § 1113); In re III Enterprises, Inc. V, 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994) (citations omitted), aff'd, 169 B.R. 551 (E.D. Pa. 1994).

35.    It is well established that the court should approve a debtor's motion to assume or reject an executory contract if the debtor's decision is based on its "business judgment." See In re Decora Indus., Inc., 2002 WL 32332749, at *8 (D. Del. 2002); Official Comm. for Unsecured Creditors v. Aust (In re Network Access Solutions, Corp.), 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule"); In re Exide Techs., 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard"). See also Phar Mor, Inc. v. Strouss Bldg. Assocs., 204 B.R. 948, 952 (N.D. Ohio 1997) ("Courts should generally defer to a debtor's decision whether to reject an executory contract.") (citation omitted).[6]

36.    To determine if the business judgment test is met, the court "is required to examine whether a reasonable business person would make a similar decision under similar circumstances." Exide Techs., 340 B.R. at 239 ("This is not a difficult standard to satisfy and requires only a showing that rejection will benefit the estate."). Specifically, a court should find that the assumption or rejection is elected on "an informed basis, in good faith, and with the honest belief that the assumption ... [is] in the best interests of [the debtor] and the estate."

---

[6]    Further, "[n]othing in the Code suggests that the debtor may not modify its contracts when all parties to the contract consent." Network Access Solutions, 330 B.R. at 74 (citation omitted). While "[s]ection 363 of the Bankruptcy Code allows a debtor to ... modify contracts ... [t]o the extent they are outside the ordinary course of business, court approval is necessary." Id. Regardless, "[t]here is ... no discernable difference in the notice requirements or standard for approval under section 363 and 365." Id.

Network Access Solutions, 330 B.R. at 75. Under this standard, a court should approve a debtor's business decision unless that decision is the product of bad faith or a gross abuse of discretion. See Computer Sales Int'l, Inc. v. Federal Mogul (In re Federal Mogul Global, Inc.), 293 B.R. 124, 126 (D. Del. 2003); Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043, 1047 (4th Cir. 1985).

37.    In the present case, the Selling Debtors' decision to effect the sale of the Assets, including the assumption and assignment of the Purchased Contracts in accordance with the Bidding Procedures Order, clearly meets the business judgment standard and satisfies the requirements of section 365 of the Bankruptcy Code. As discussed above, the Sale Transaction will provide significant benefits to the Selling Debtors' estates. The Purchased Contracts are necessary for the Purchaser or other Successful Bidder to conduct the business, and, since no purchaser would take the Assets without such Purchased Contracts, the assumption and assignment thereof is essential to inducing the highest or best offer for the Assets.

38.    Further, pursuant to the terms of the proposed Stalking Horse Agreement, applicable cure payments will be borne by the Purchaser. Because the Selling Debtors cannot otherwise obtain the benefits of the Stalking Horse Agreement, the assumption of the Purchased Contracts is undoubtedly a sound exercise of the Selling Debtors' business judgment. Finally, by way of the competitive bidding process promulgated under the Bidding Procedures, the Sale Transaction will maximize the value of the Purchased Contracts for the Selling Debtors' estates. Accordingly, to the extent that the Selling Debtors can sell any related executory contracts and unexpired leases in connection with the sale of the Assets, they will be able generate cash to the benefit of their estates.

K&E 14529705.

### B. The Counterparties To Purchased Contracts Will be Adequately Protected.

39. A debtor in possession may assign an executory contract or an unexpired lease of the debtor if it assumes the agreement in accordance with section 365(a) of the Bankruptcy Code and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement. See 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "a practical pragmatic construction." EBG Midtown South Corp. v. McLaren/Hart Envtl. Eng'g. Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), aff'd, 993 F.2d 300 (2d Cir. 1993); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

40. Significantly, among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. See, In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (stating that adequate assurance of future performance is present when the prospective assignee of lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

41. To the extent Purchased Contracts are assumed by the Selling Debtors and assigned to the Purchaser or other Successful Bidder, the Selling Debtors believe that they can and will demonstrate that all requirements for assumption and/or assignment of the such Purchased Contracts will be satisfied at the Sale Hearing. As required under the Bidding Procedures, the Selling Debtors will evaluate the financial wherewithal of Potential Bidders prior to designating such Potential Bidder a Qualified Bidder (without which designation parties are not able to bid). Specifically, the Selling Debtors will consider the financial credibility, willingness and ability of the interested party to perform under the Purchased Contracts.

K&E 14529705.

Moreover, counterparties will have adequate time and opportunity to object to the assumption or proposed Cure Amount.

42.     For the reasons stated throughout this Motion, the Selling Debtors, in exercising their sound business judgment, believe that selling the Assets and assuming and assigning the Purchased Contracts is in the best interests of their estates.  Moreover, the Selling Debtors will provide all counterparties to such Purchased Contracts with notice of the potential assumption and assignment of their agreements and an opportunity to be heard, as described above.

**III.     Ample Authority Exists to Authorize the Sale Pursuant to the Bidding Procedures.**

43.     In accordance with Bankruptcy Rule 6004, sales of property rights outside the ordinary course of business may be by private sale or public auction.  Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan.  However, courts in this Circuit and others have required that the decision to sell assets outside the ordinary course of business be based on the sound business judgment of the debtors.  See, e.g., In re Abbotts Dairies of Penn., Inc., 788 F.2d 143 (3d Cir. 1986); Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); The Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999).

44.     Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, bankruptcy courts routinely authorize sales of a debtor's assets if such sale is based upon the sound business judgment of the debtor.  See, e.g., Martin, 91 F.3d at 395; Montgomery Ward, 242 B.R. at 153; In re Del. & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Trans World Airlines, Inc., No. 01-00056, 2001 Bankr. LEXIS 980, at *29 (Bankr. D. Del. Apr. 2, 2001).

K&E 14529705.

45.     Courts in this district typically consider four main factors to determine if a proposed sale satisfies the business judgment standard, namely, whether, (a) a "sound business purpose" justifies the sale of assets outside the ordinary course of business, (b) adequate and reasonable notice has been provided to interested persons, (c) the debtors have obtained a fair and reasonable price and (d) the parties have acted in good faith. See, e.g., Del. & Hudson Ry., 124 B.R. at 176; In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987); In re United Healthcare Sys., Inc., No. 97-1159, 1997 U.S. Dist. LEXIS 5090, at * 13-14 and n.2 (D. N.J. Mar. 26, 1997). The Del. & Hudson Railway court further held that:

> [o]nce a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale, the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and that the [proposed] purchaser is proceeding in good faith.

See Del. & Hudson Ry., 124 B.R. at 176.

### A.     A Sound Business Purpose Exists for the Sale.

46.     A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders. See In re Lionel Corp., 722 F.2d 1063 (2nd Cir. 1983). In fact, the paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. See Food Barn, 107 F.3d at 564-65 (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); Integrated Resources, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the ... [Debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting In re Atlanta Packaging Prods., Inc., 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

K&E 14529705.

47.     Once a debtor articulates a reasonable basis for its business decisions (as distinct

from a decision made arbitrarily or capriciously), courts will generally not entertain objections to

the debtor's conduct.    See, e.g., Comm. of Asbestos-Related Litigants and/or Creditors v.

Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

There is a presumption that "in making a business decision the directors of a corporation acted

on an informed basis, in good faith and in the honest belief that the action taken was in the best

interests of the company." In re Integrated Resources, 147 B.R. at 656 (quoting Smith v. Van

Gorkom, 488 A.2d 858, 872 (Del. 1985)).    Thus, if a debtor's actions satisfy the business

judgment rule, then the transaction in question should be approved under section 363(b)(1).

Indeed, when applying the "business judgment" standard, courts show great deference to a

debtor's business decisions.    See Pitt v. First Wellington Canyon Assocs. (In re First Wellington

Canyon Assocs.), 1989 WL 106838, at *3 (N.D. Ill. 1989) ("Under this test, the debtor's

business judgment . . . must be accorded deference unless shown that the bankrupt's decision

was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

48.     The Selling Debtors submit that more than ample business justification exists to

sell the Assets to the Purchaser or other Successful Bidder pursuant to the Bidding Procedures

and on substantially the terms set forth in the Stalking Horse Agreement.  The Selling Debtors

have determined that the sale of the Acquired Assets, pursuant to the Bidding Procedures and by

public auction, if one is necessary, should enable them to obtain the highest or best offer for the

Assets (thereby maximizing the value of their estates) and is in the best interests of their estates

and stakeholders.

49.     The Sale of the Assets through a competitive bidding process will test the market

for the assets, and ultimately provide the greatest possible recovery for the Selling Debtors'

K&E 14529705.

estates as compared to any other available existing alternative while allowing the Selling Debtors to sell the Assets as promptly as practicable. Given the circumstances facing the Selling Debtors as a result of their precipitously declining liquidity position, it is necessary to promptly sell the Assets to avoid a deterioration in the value of the Assets. The Selling Debtors believe that the relief sought by this Motion is not only reasonable, but necessary, to maximize the value of their estates for the benefit of stakeholders. Accordingly, the Selling Debtors submit that the decision to effectuate the Sale on the terms proposed herein demonstrates a sound business purposes in satisfaction of the first prong of the above-stated business judgment standard.

**B.      There Will be Adequate and Reasonable Notice of the Sale.**

50.      All creditors and parties in interest will receive adequate notice under the circumstances of the Bidding Procedures and the Sale Hearing as described herein. Within three (3) days of the entry of the Bidding Procedures Order, the Selling Debtors shall serve the Sale Notice upon the parties identified in the Bidding Procedures Order, and will publish the Sale Notice (modified for publication, as necessary) in *The Wall Street Journal*, national edition, and in such other publications, if any, as the Selling Debtors and their advisors determine will best-promote the marketing and sale of the Assets.

51.      To ensure that the counterparties to Purchased Contracts receive advance notice of the assumption and assignment thereof, within two (2) days of the date the Selling Debtors file the Assumption and Assignment Schedule with the Bankruptcy Court (or the amended Assumption and Assignment Schedule, as applicable), the Selling Debtors will serve the Cure Notice upon each counterparty to a Purchased Contract. The Cure Notice will, among other things, (i) identify the Purchased Contract proposed to be assumed and assigned and the associated Cure Amount, (ii) provide a means by which counterparties to Purchased Contracts can obtain information related to adequate assurance of future performance, (iii) instruct

counterparties to Purchased Contracts as to the ways by which they may obtain and/or view copies (including electronic copies) of the Bidding Procedures, the Bidding Procedures Order and other related documents, (iv) set forth the date and time of the Sale Hearing and (v) explain how to file Cure Objections.

52. In light of the circumstances, such notice is reasonably calculated to provide timely and adequate notice to the Selling Debtors' major creditor constituencies, those parties most interested in these cases, those parties potentially interested in bidding on the Selling Debtors' assets and business and others whose interests are potentially implicated by the proposed Sale, including counterparties to Purchased Contracts.

53. The Selling Debtors submit that such notice is adequate for entry of the Sale Order and satisfies the requisite notice provisions required under sections 363(b) and 365 of the Bankruptcy Code. The Selling Debtors believe that the notice provisions summarized herein and set forth in greater detail in the Bidding Procedures Order comply with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Sale, the Bidding Procedures, the Auction, the Cure Amounts (as applicable) and the Sale Hearing to the Selling Debtors' creditors and other parties in interest that are entitled to notice of the Sale, as well as to those parties who have expressed an interest, or may express an interest, in bidding on the Acquired Assets. Accordingly, the Selling Debtors submit that the form and manner of both the Sale Notice and Cure Notice satisfy the second prong of the above-described business judgment standard, and respectfully request that this Court approve the form and manner of the Sale Notice proposed herein.

### C. The Sale Will Yield a Fair and Reasonable Price for the Purchased Assets.

54. As noted above, the Bidding Procedures are designed to maximize the value received for the Assets. The process proposed by the Selling Debtors allows for a timely auction

process, given the circumstances currently facing the Selling Debtors, while providing financially capable bidders with ample time and information to submit a timely and well-informed bid, consistent with the requirements of the Bankruptcy Code, the Bankruptcy Rules and pursuant to procedures approved by this Court.

55.     Consequently, the fairness and reasonableness of the terms and conditions of the Stalking Horse Agreement, including the purchase price, will be demonstrated by a "market check" by permitting prospective purchasers to bid on the Assets and, if necessary, further established by adequate "market exposure" by way of the solicitation of competing bids in a court-supervised, open and fair auction process as set forth in the Bidding Procedures (which is by and large the best means available to determine whether a fair and reasonable price is being paid, regardless of whether it is ultimately conducted). Accordingly, the Selling Debtors and all parties in interest can be assured that the consideration received for the Assets under the bidding and sale process established under the Bidding Procedures will be fair and reasonable, thus satisfying the third prong of the business judgment standard set forth above.

**D.      The Sale Is Being Proposed in Good Faith and the Purchaser or Other Successful Bidder Is a Good Faith Purchaser and Should be Protected.**

56.     As discussed herein and as will be further demonstrated at the Sale Hearing, the Bidding Procedures, Bidding Procedures Order, Sale Order and Stalking Horse Agreement are each the product of extensive, good-faith, arm's-length negotiations among sophisticated parties all of whom were represented by legal counsel and other professional advisors.

57.     Section 363(m) of the Bankruptcy Code preserves the validity of section 363 sales even when the authorization to make such a sale is reversed on appeal so long as the sale was made in good faith. Thus, Section 363(m) of the Bankruptcy Code protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its

33

interest in the purchased assets if the order allowing the sale is reversed on appeal. Although the Bankruptcy Code does not define "good faith purchaser," courts generally agree that "[t]he requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the courts of the sale proceedings. See Abbotts Dairies, 788 F.2d at 147. Typically, the misconduct that could destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." Id.

58.     Although the Bankruptcy Code does not define "good faith purchaser," the Third Circuit, construing section 363(m) of the Bankruptcy Code, has stated that "the phrase encompasses one who purchases in 'good faith' and for 'value.'" Abbotts Dairies, 788 F.2d at 147 (to constitute lack of good faith, a party's conduct in connection with the sale must usually amount to fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders); see also In re Bedford Springs Hotel, Inc., 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); In re Perona Bros., Inc., 186 B.R. 833, 839 (D.N.J. 1995).

59.     In other words, a party would have to show fraud or collusion between the buyer and the debtor in possession or trustee or other bidders in order to demonstrate a lack of good faith. See Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.), 111 F.3d 269, 276 (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a [buyer]'s good faith status at a judicial sale involves fraud, collusion between the [buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders"); see also In re Angelika Films, 57th, Inc., 1997 WL 283412, at *7 (S.D.N.Y. 1997); In re Bakalis, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998). Due to the absence of a bright line test for good faith, the

determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct in the course of the sale proceedings." In re Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1998 (7th Cir. 1978)).

60.     In this case, there is absolutely no indication of fraud or improper insider dealing of any kind.  With respect to the Potential Bidders, the Bidding Procedures are designed to ensure that no party is able to exert undue influence over the process.  With respect to the Stalking Horse Agreement and the Purchaser thereunder, upon execution, such agreement will have been negotiated at arm's-length and in good faith.  In particular, once executed, per the terms of the Stalking Horse Agreement, the Purchaser will have recognized that the Selling Debtors were free to deal with any other party interested in acquiring the Assets and will have complied with the provisions in the Bidding Procedures Order and agreed to subject its bid to the competitive bidding procedures set forth in the Bidding Procedures and approved under the Bidding Procedures Order.  In addition, all payments to be made by the Purchaser and/or any other agreements or arrangements entered into by the Purchaser in connection with the Sale will have been publicly disclosed and approved by this Court.

61.     Moreover, the Bidding Procedures are designed to prevent the Selling Debtors or the Purchaser or other Successful Bidder in accordance with the Bidding Procedures from engaging in any conduct that would cause or permit the Sale of the Assets to be avoided under section 363(n) of the Bankruptcy Code.  Under the circumstances, then, the Successful Bidder in accordance with the Bidding Procedures should be afforded the protections that section 363(m) of the Bankruptcy Code provides to a good faith purchaser.

62.     Additionally, by its terms, section 363(m) of the Bankruptcy Code applies to sales of interests in tangible assets, such as the Purchased Contracts.  Additionally, the Third Circuit

has indicated that section 363(m) of the Bankruptcy Code also protects the assignee of a debtor's interest in executory contracts under section 365 of the Bankruptcy Code. See Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc., 141 F.3d 490, 497-98 (3d. Cir. 1998). Despite the absence of an explicit reference to assignments of executory contracts under section 365 of the Bankruptcy Code, the Krebs Court concluded that section 363(m) of the Bankruptcy Code protected an assignment of a debtor's interest in certain automobile franchise agreements pursuant to an auction sale.

63.    Like the agreements in Krebs, the Purchased Contracts may be assumed and assigned pursuant to section 365 of the Bankruptcy Code. As required by section 363(m) of the Bankruptcy Code, the Bidding Procedures have been proposed in good faith and provide for both the Selling Debtors and the Purchaser or other Successful Bidder to act in good faith in negotiating the Sale of the Assets, including Purchased Contracts, and, thus, the Selling Debtors respectfully submit that section 363(m) of the Bankruptcy Code applies to protect the Purchaser or other Successful Bidder in accordance with the Bidding Procedures with respect to both the Purchased Assets and the Purchased Contracts included in the Successful Bid.

64.    Accordingly, under the extant facts and circumstances here, the proposed Sale Transaction and procedures, documents and processes related thereto satisfy the fourth prong of the above-described business judgment standard and, as such, the Purchaser or other Successful Bidder in accordance with the Bidding Procedures should be afforded all the protections of a "good faith purchaser" under 363(m) of the Bankruptcy Code.

## IV.    The Sale of Assets Should be Free and Clear of All Interests Pursuant to Section 363(f) of the Bankruptcy Code, Including Any Successor Liabilities.

65.    Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell all or any part of its property free and clear of any and all liens, claims or interests in such property

if: (a) such a sale is permitted under applicable non-bankruptcy law; (b) the party asserting such a lien, claim or interest consents to such sale; (c) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the party asserting the lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. See 11 U.S.C. § 363(f). This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." See 11 U.S.C. § 105(a).

66.     Because Bankruptcy Code section 363(f) is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Acquired Assets "free and clear" of liens and interests. In re Dundee Equity Corp., 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. March 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met"); Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (same); Mich. Employment Sec. Comm'n v. Wolverine Radio Co., Inc. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met). Furthermore, courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by section 363(f) of the Bankruptcy Code. See, e.g., In re Trans World Airlines, Inc., 2001 WL 1820325 at *3, 6 (Bankr. D. Del. March 27, 2001).

67.     One or more of the tests enumerated in section 363(f) of Bankruptcy Code will be satisfied with respect to the sale of the Assets. In particular, at least section 363(f)(2) will be met

K&E 14529705.

in connection with the transactions proposed because the parties holding liens on the Assets, if any, will consent, or absent any objection to this Motion, will be deemed to have consented to, the Sale. Any lienholder also will be adequately protected by having their encumbrances, if any, in each instance against the Selling Debtors or their estates, attach to the cash proceeds of the Sale ultimately attributable to the Assets in which such creditor alleges an interest, in the same order of priority, with the same validity, force and effect that such creditor had prior to the Sale, subject to any claims and defenses the Selling Debtors and their estates may possess with respect thereto. Accordingly, section 363(f) authorizes the transfer and conveyance of the Assets free and clear any such Encumbrances.

68. In addition, courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes free from successor liability resulting from pre-existing claims. See Ninth Ave. Remedial Group v. Allis-Chalmers Corp., 195 B.R. 716, 732 (N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.), 837 F.2d 89, 93-94 (2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale free and clear under section 363(f) of the Bankruptcy Code); New England Fish Co. v. Alaska Pacific Consortium (In re New England Fish Co.), 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale included free and clear of Title VII employment discrimination and civil rights claims of debtor's employees); In re Hoffman, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free and clear of any interest permissible even though the estate had unpaid taxes); Am. Living Sys. v. Bonapfel (In re All Am. of Ashburn, Inc.), 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986) (product liability claims precluded on successor doctrine in a sale of assets free and clear); WBQ P'ship v.

_Virginia Dept. of Med. Assis. Servs. (In re WBQ P'ship)_, 189 B.R. 97, 104-05 (Bankr. E.D. Va. 1995) (right to recapture depreciation is an "interest" as used in section 363(f)).[7]

69.     The purpose of an order purporting to authorize the transfer of assets free and clear of all "interests" would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against the Purchaser or other Successful Bidder in accordance with the Bidding Procedures arising from the Selling Debtors' pre-sale conduct.   Under section 363(f) of the Bankruptcy Code, the Purchaser or other Successful Bidder in accordance with the Bidding Procedures is entitled to know that the Assets are not infected with latent claims that will be asserted against the Purchaser or other Successful Bidder in accordance with the Bidding Procedures after the proposed transaction is completed.

## V.     The Requirements of Bankruptcy Rule 6003(b) Have Been Satisfied.

70.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise."   Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise."   The Selling Debtors request that any order approving the Sale and the assumption and assignment of the Purchased Contracts be effective immediately by providing that the 10-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

---

[7]   Even courts concluding that section 363(f) of the Bankruptcy Code does not empower them to convey assets free and clear of claims have nevertheless found that section 105(a) of the Bankruptcy Code provides such authority.  See _Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)_, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (stating that the absence of specific authority to sell assets free and clear of claims poses no impediment to such a sale, as such authority is implicit in the court's equitable powers when necessary to carry out the provisions of title 11).

71. The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 10-day stay period, the leading treatise on bankruptcy suggests that the 10-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy ¶ 6004.10 (15th rev. ed. 2006). Furthermore, Collier suggests that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. Id.

72. To maximize the value received for the Assets, the Selling Debtors seek to close the sale as soon as possible after the Sale Hearing. Accordingly, the Selling Debtors hereby request that the Court waive the 10-day stay period under Bankruptcy Rules 6004(h) and 6006(d) or, in the alternative, if an objection to the sale is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal.

## Reservation of Rights

73. Nothing contained herein is intended to or should be construed as an admission of the validity of any claim against Norwood or a waiver of Norwood's rights to dispute any claim. Norwood expressly reserves the rights to contest any demand for payment made with respect to the subject matter of this Motion under applicable non-bankruptcy law. Likewise, if this Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to and should not be construed as an admission of the validity of any claim or a waiver of Norwood's right to dispute such claim subsequently.

K&E 14529705.

## Notice

74.     Norwood has provided notice of this Motion either by electronic mail, facsimile and/or by overnight mail to:   (a) the Office of the United States Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the Thirty Largest Unsecured Claims filed contemporaneously herewith; (c) counsel to the agent for Norwood's proposed debtor-in-possession lenders; (d) counsel to the agent for each of Norwood's proposed postpetition secured lending groups; (e) counsel to the agent for each of Norwood' prepetition secured lending groups; (f) the Internal Revenue Service; (g) the Securities and Exchange Commission; and (h) any persons who have filed a request for notice in the above-captioned cases pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, Norwood respectfully submits that no further notice is necessary.

## No Prior Request

75.     No prior motion for the relief requested herein has been made to this or any other court.

K&E 14529705.

WHEREFORE, for the reasons set forth herein and in the First Day Declaration, Norwood respectfully requests that the Court enter an order, substantially in the form attached hereto as Exhibit A, granting the relief requested herein and granting such other and further relief as the Court deems appropriate.

Dated: May 5, 2009
Wilmington, Delaware

**YOUNG CONAWAY
STARGATT & TAYLOR, LLP**

/s/ Margaret Whiteman Greecher
Pauline K. Morgan (No. 3650)
Edmon L. Morton (No. 3856)
Margaret Whiteman Greecher (No. 4652)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone:    (302) 571–6637
Facsimile:    (302) 576–3320

- and -

**KIRKLAND & ELLIS LLP**
David L. Eaton (*pro hac vice* admission pending)
300 North LaSalle Drive
Chicago, Illinois 60654
Telephone:    (312) 862–2000
Facsimile:    (312) 862–2200

- and -

**KIRKLAND & ELLIS LLP**
Lisa G. Laukitis (*pro hac vice* admission pending)
Citigroup Center
153 East 53rd Street
New York, New York 10022–4611
Telephone:    (212) 446–4800
Facsimile:    (212) 446–4900

Proposed Co-Counsel for the Debtors and Debtors in Possession

K&E 14529705.